******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOSE R. ROSADO
(AC 34533)

Alvord, Bear and Harper, Js.

*Argued October 15, 2013—officially released January 21, 2014*

(Appeal from Superior Court, judicial district of
Hartford, Schuman, J.)

*Jeanne M. Zulick*, assigned counsel, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with
whom, on the brief, were *Gail P. Hardy*, state's attorney, and *John F. Fahey*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Jose R. Rosado, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit home invasion in violation of General Statutes §§ 53a-48 and 53a-100aa (a) (2), conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-48 and 53a-101 (a) (1), and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (4).[1] On appeal, the defendant claims that (1) the evidence was insufficient to sustain his convictions as to all three offenses, and (2) the court improperly failed to respond to the jury's request for a clarifying instruction on the crime of conspiracy. We disagree and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately 10 p.m. on November 12, 2009, Jose Guerrero was standing outside of an apartment on Cannon Road in East Hartford talking on his cell phone. Jose Guerrero was in the process of moving into the apartment, which was shared by his brother, Carlos Guerrero, and his cousin, Urias Abrego Vasques. He saw two Hispanic men, who had been walking back and forth in front of the apartment, enter the building. Carlos Guerrero and Vasques were home at that time. They each had separate bedrooms, and the two Hispanic men forced their way into Carlos Guerrero's bedroom. One of the men was wearing a white jacket with stripes, a white and red mask, a white baseball cap and an orange wig. The other man was dressed in black and was wearing a black ski mask with a large opening around the eyes. Both men had weapons; the man in white was carrying a knife, and the man in black was armed with a gun. During a struggle with the assailants, Carlos Guerrero was hit on the head with the gun, cut on his neck by the knife and thrown to the floor. The men took his wallet, which contained his money, some receipts and his brother's identification card.

Vasques heard noise coming from the other bedroom and a voice saying that he didn't have any money. Vasques opened his bedroom door and saw the man with the gun coming toward him. He recognized the eyes of the person behind the black ski mask because that person was his neighbor and the brother of his friend. Vasques shut the door and locked it, and then he jumped out of his bedroom window and ran down the street. A police officer happened to be in the area investigating an unrelated incident, and Vasques ran up to him and reported the incident.

When the two assailants left the apartment, Carlos Guerrero ran out of the apartment and followed them. Jose Guerrero, still outside, saw his brother chasing the men and also ran after them. At one point, one of the men pointed a gun at Carlos Guerrero, but he then

put it away and kept running. Jose Guerrero pursued the men until the police stopped him. Carlos Guerrero continued the pursuit until one of the men dropped his white baseball cap, and Carlos Guererro stopped to retrieve it. He then located a police officer and gave him the cap.

Vasques went to the East Hartford police station that evening to give a statement. On the basis of the information he provided, the police prepared a photographic array of possible suspects. Vasques identified the defendant as the assailant who wore the black ski mask. When Carlos Guerrero was interviewed by the police that evening, he drew a map showing the path taken by the assailants as he chased them.

That same evening, Sergeant Steven Syme of the East Hartford Police Department was dispatched to another apartment complex on Cannon Road after receiving information that one of the suspects might live at that location. As Syme approached the building, he heard a woman in one of the apartments arguing on the telephone by an open window. He discovered that she was in the apartment thought to be occupied by the suspect. Syme approached her and determined that she was Vicky Rosado, who is the defendant's sister. Vicky Rosado told Syme that she lived in the apartment with her brother, but she said that her brother's name was "Rueben Robot." The defendant was not in the apartment at that time.

Detective Ellen Stoldt also was dispatched to Cannon Road that evening for the purpose of searching the area surrounding the crime scene for evidence connected with the armed invasion. It was after midnight when she located a long sleeved black shirt, a black ski mask, a white sweatshirt with printing on it and a wig along the route taken by the assailants as they fled. Stoldt made the decision to return to that location the following day during daylight hours to search for additional evidence that she might have overlooked during the initial search. When she returned, she discovered a wallet, an identification card and several receipts. Stoldt continued her investigation by interviewing Vasques, Vicky Rosado and Kevin Saninocencio, a person who supposedly had been at Vicky Rosado's apartment on the night of the incident.

From the physical evidence and the interviews, the police developed a list of potential suspects that included the defendant, Saninocencio and Jose Flores. Jose Flores, also known as Chaio, was never interviewed because he left for Puerto Rico shortly after the incident. The defendant was arrested in December, 2009, and transported to the East Hartford Police Department. He voluntarily gave a statement to Stoldt about the evening in question. He told her that he had been living with his sister and that he was at her apartment when Chaio arrived carrying a book bag. Chaio

pulled a gun from the bag and said that he wanted to rob "the Mexican dudes up the street."[2] The defendant told Stoldt that he left the apartment while Chaio was still there and that he spent the rest of the evening at a friend's house. He said that he learned the next day that "the Mexican dudes up the street" were robbed the night before. The defendant also told Stoldt that the details of that night were "vague" because he had been "drunk" when everything happened. In his written statement, the defendant stated: "I drink a lot, and I am usually drunk. If I did do this robbery, it was during a time that I was very drunk, and I can't remember it."

The case was tried on October 31, November 1 and 2, 2011. During the trial, the state's witnesses included Jose Guerrero, Carlos Guerrero, Vasques, Vicky Rosado, Saninocencio, police officers, investigators and forensic experts. Vicky Rosado testified that at approximately 6 p.m. on November 12, 2009, Chaio, the defendant and two other men were at her apartment as she was getting ready to go out for the evening. Before she left, she saw the defendant and Chaio having a conversation: "[T]hey were just whispering . . . ." Later that evening, after she returned to the apartment, the police arrived, and she let them search the apartment. Subsequently, she was asked to come to the police station to give a statement. While there, she was shown a ski mask, a white sweatshirt with print on it, a wig, a black T-shirt and a white hat. She told the police that she recognized the items as items from her home. She said that the Halloween wig had been in her daughter's playbox, the T-shirt looked like the defendant's T-shirt, and the white sweatshirt looked like her friend's sweatshirt.

At trial, Carlos Guerrero identified the wallet, receipts and his brother's identification card that had been found by Stoldt. Saninocencio testified that he had been at Vicky Rosado's apartment on the night of the incident and that he heard the defendant and Chaio "talking about doing some kind of harm." When pressed for details, he said that they were "planning on doing something" and "[t]hat they were going to rob those people." He further testified that Chaio was wearing a white sweater and a wig.

The state's final witness was Eric Carita, a forensic science examiner in the DNA unit at the state's forensic science laboratory. Carita testified that the defendant was a contributor to the DNA profile obtained from the swabbing of the inside rim of the white baseball cap that had been retrieved by Carlos Guerrero from one of the assailants. Further, the defendant was a contributor to the DNA profile obtained from the swabbing of the inside of the black ski mask.

Following the trial, the jury found the defendant guilty of conspiracy to commit home invasion, conspiracy to commit burglary in the first degree and conspir-

acy to commit robbery in the first degree. The court accepted the verdict and rendered judgment accordingly. The defendant was sentenced to eight years of incarceration, followed by six years of special parole.[3] This appeal followed.

I

The defendant's first claim is that the evidence produced at trial was insufficient to sustain his convictions of conspiracy to commit home invasion, conspiracy to commit burglary in the first degree and conspiracy to commit robbery in the first degree. The defendant argues that "his convictions on the conspiracy counts were based on inconsistent testimony and circumstantial evidence that failed to link him to these crimes and could not possibly lead to the drawing of any reasonable inference that he entered [into] a conspiracy to commit any crime." Specifically, he claims that there was insufficient evidence that (1) he was one of the two masked men who entered the victims' apartment, (2) he entered into an agreement with the specific intent of committing a crime, and (3) he or a coconspirator engaged in an overt act in furtherance of a home invasion, burglary or robbery.

"We apply a two part test in reviewing sufficiency of the evidence claims. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . While . . . every element [must be] proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Jennings*, 125 Conn. App. 801, 805–806, 9 A.3d 446 (2011).

"[T]he probative force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence. . . . It has been repeatedly stated that there is no legal distinction between direct and circumstantial evidence so far as probative force is concerned. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Riser*, 70 Conn. App. 543, 552, 800 A.2d 564

(2002).

"[I]n viewing evidence which could yield contrary inferences, the [trier of fact] is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the [trier of fact's] function is to draw whatever inferences from evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Jagat,* 111 Conn. App. 173, 177, 958 A.2d 206 (2008).

We first note that the defendant's claims of insufficiency of the evidence are directed to possible conflicting testimony at trial. In other words, the defendant is challenging the credibility of the state's witnesses. "[E]vidence is not insufficient . . . because it is conflicting or inconsistent. . . . It is the [jury's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses. . . . The [jury] can . . . decide what—all, none, or some—of a witness' testimony to accept or reject." (Internal quotation marks omitted.) *State* v. *Vega,* 128 Conn. App. 20, 27, 17 A.3d 1060, cert. denied, 301 Conn. 919, 21 A.3d 463 (2011).

With these principles in mind, we turn to the specific elements of the offenses at issue. To establish the crime of conspiracy under § 53a-48,[4] the state was required to prove that there was an agreement between two or more persons to engage in conduct constituting a crime and that one of the conspirators committed an overt act in furtherance of the crime agreed upon. Proof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense. See *State* v. *Douglas,* 126 Conn. App. 192, 202–203, 11 A.3d 699, cert. denied, 300 Conn. 926, 15 A.3d 628 (2011). The conspired offenses in this case were home invasion,[5] burglary in the first degree[6] and robbery in the first degree.[7]

We have carefully reviewed the record, including the transcripts of the trial, and we have set forth in detail the evidence that the state presented to the jury in support of the charges of conspiracy. Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the evidence adduced at trial was more than sufficient to allow the jury to find beyond a reasonable doubt that the defendant conspired to commit home invasion, burglary in the first degree and robbery in the first degree. The testimony of the witnesses demonstrated that he agreed to commit these crimes, as defined by statute, and that overt acts were committed by him or a coconspirator in furtherance of those crimes. The defendant's insufficiency of the evidence claim merits no further discussion.

II

The defendant's next claim is that the trial court

improperly failed to respond to the jury's request for a clarifying instruction on the elements of the crime of conspiracy. The defendant argues that the court's failure to follow the mandatory provisions of Practice Book § 42-27[8] deprived him of a fair trial. The following additional facts and procedural history are necessary for the resolution of this claim.

During the course of deliberations, the court received twelve notes from the jury that were marked as court exhibits. Several inquiries dealt with requests for copies of the jury instructions, supplies or breaks for food. A few of the notes requested a review of testimony from certain witnesses. The final note, received at 4:25 p.m. on November 7, 2011, stated that the jury had reached a verdict on all six charges. It is the note immediately preceding the final note that is at issue here, which was the note that the court received at 4:10 p.m. that day. In that note, the jury asked the court to clarify the last sentence at page sixteen of its written instructions pertaining to the crime of conspiracy.[9]

In its charge, the court instructed the jury that all communications with the court needed to be in writing, signed and dated by the foreperson. The court also instructed the jury that because it could take some time to assemble the parties and to agree upon a response to a request, the jury "may continue deliberating if you can." The court was discussing with counsel a response to the penultimate note regarding the conspiracy charge when it received the jury's final note stating that it had reached a verdict. In accordance with the court's instructions, the jury had continued to deliberate and had reached a verdict before the court could address the jury's note requesting clarification of the language pertaining to the conspiracy charge.

The court, after receiving the final note and before bringing the jury into the courtroom, addressed counsel as follows:

"The Court: Counsel, we've received some notes from the jury that will be marked as court exhibits. Earlier today, we received notes in which the jurors asked for copies of the court's instructions and magic markers, and we provided those. Then at 4:10 [p.m.], we received a note from the jury asking for clarification of the conspiracy discussions. While I was discussing that with counsel, at 4:25 p.m., we received a note from the jury saying we have a verdict on all six charges. So, absent objection, I propose that we proceed directly to receiving the verdict.

"[The Prosecutor]: Yes, Your Honor.

"[Defense Counsel]: Yes, Your Honor.

"The Court: Mark these and we'll call the jury."

Now, on appeal, the defendant raises for the first time his claim that the trial court was obligated to

respond to the jury's note requesting clarification of the conspiracy charge before it could proceed to a verdict. The defendant acknowledges that he did not object to the court's proposal to proceed to a verdict at the time of trial, but he argues that the provisions of Practice Book § 42-27 are mandatory and cannot be waived by defense counsel. He seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[10] or to prevail under the plain error doctrine. The state argues that defense counsel waived any claim regarding the handling of the note at issue when he expressly assented to the court's proposed course of action. We agree with the state.

"A defendant in a criminal prosecution may waive one or more of his or her fundamental rights. . . . [I]n the usual *Golding* situation, the defendant raises a claim on appeal [that], while not preserved at trial, at least was not waived at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 467, 10 A.3d 942 (2011). "Both our Supreme Court and this court have stated the principle that, when a party abandons a claim or argument before the trial court, that party waives the right to appellate review of such claim because a contrary conclusion would result in an ambush of the trial court . . . . [W]aiver is [t]he voluntary relinquishment or abandonment— express or implied—of a legal right or notice. . . . In determining waiver, the conduct of the parties is of great importance. . . . [W]aiver may be effected by action of counsel. . . . When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal. . . . Thus, [w]aiver . . . involves the idea of assent, and assent is an act of understanding." (Citation omitted; internal quotation marks omitted.) *State* v. *McLaughlin*, 135 Conn. App. 193, 198, 41 A.3d 694, cert. denied, 307 Conn. 904, 53 A.3d 219 (2012).

"The rule is applicable that no one shall be permitted to deny that he intended the natural consequences of his acts and conduct. . . . In order to waive a claim of law it is not necessary . . . that a party be certain of the correctness of the claim and its legal efficacy. It is enough if he knows of the existence of the claim and of its reasonably possible efficacy. . . . Connecticut courts have consistently held that when a party fails to raise in the trial court the constitutional claim presented on appeal and affirmatively acquiesces to the trial court's order, that party waives any such claim." (Internal quotation marks omitted.) *State* v. *Velez*, 113 Conn. App. 347, 357–58, 966 A.2d 743, cert. denied, 291 Conn. 917, 970 A.2d 729 (2009).

The reason that the objection must be raised at trial is to afford the court an opportunity to correct an allegedly improper ruling or procedure. "When we speak of correcting the claimed error, we mean when it is possible

during that trial, not by ordering a new trial. We do not look with favor on parties requesting, or agreeing to, an instruction or a procedure to be followed, and later claiming that that act was improper." (Internal quotation marks omitted.) Id., 358. "[A] defendant may not pursue one course of action at trial for tactical reasons and later on appeal argue that the path he rejected should now be open to him . . . ." (Internal quotation marks omitted.) *State* v. *Thompson*, 146 Conn. App. 249, 260–61, 76 A.3d 273, cert. denied, 310 Conn. 956, A.3d (2013).

"A defendant who has waived a claim at trial . . . is not entitled to *Golding* review. . . . [A] constitutional claim that has been waived does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *McLaughlin*, supra, 135 Conn. App. 198. Furthermore, "[a] valid waiver . . . thwarts plain error review of a claim. [The] Plain Error Rule may only be invoked in instances of forfeited-but-reversible error . . . and cannot be used for the purpose of revoking an otherwise valid waiver. This is so because if there has been a valid waiver, there is no error for us to correct." (Internal quotation marks omitted.) *State* v. *Velez*, supra, 113 Conn. App. 361 n.8.

In the present case, the trial court, after stating on the record that it had received the jury note requesting a clarification of the conspiracy charge and the subsequent jury note indicating that the jury had reached a verdict, made the following suggestion to counsel: "So, absent objection, I propose that we proceed directly to receiving the verdict." If defense counsel disagreed with the court's proposal and preferred that the jury note requesting clarification be addressed, the court had given him the opportunity to express his thoughts on the matter. Defense counsel, however, raised no objection to proceeding to verdict without addressing the penultimate jury note and, in fact, affirmatively agreed to the court's proposal. Permitting the defendant now to seek reversal of his conviction due to the procedure followed by the court, to which defense counsel expressly assented at trial, would result in an ambuscade of the trial court.

The defendant argues, however, that Practice Book § 42-27 is mandatory; see *State* v. *Fletcher*, 10 Conn. App. 697, 702, 525 A.2d 535 (1987), aff'd, 207 Conn. 191, 540 A.2d 370 (1988); and cannot be waived by defense counsel. He cites no persuasive authority in support of the claim that the rule cannot be waived, and our case law indicates to the contrary. "Although a defendant will not be deemed to have waived certain constitu-

tional rights unless the state can demonstrate that the defendant's waiver was knowing and intelligent; see, e.g., *State* v. *T.R.D.*, 286 Conn. 191, 202–203, 942 A.2d 1000 (2008) (defendant's waiver of counsel must be knowing and intelligent); *State* v. *Reid*, 277 Conn. 764, 780, 894 A.2d 963 (2006) (defendant's guilty plea must be knowing and voluntary); that requirement is inapplicable when . . . counsel has waived a potential constitutional claim in the exercise of his or her professional judgment. . . . In our adversary system, the trial court was entitled to presume that defense counsel was familiar with [case law] and had acted competently . . . . To conclude otherwise would require the trial court to canvass defense counsel with respect to counsel's understanding of the relevant constitutional principles before accepting counsel's agreement on how to proceed. For good reason, there is nothing in our criminal law that supports such a requirement." *State* v. *Holness*, 289 Conn. 535, 544, 958 A.2d 754 (2008).

In summary, defense counsel agreed to the court's proposal to proceed to a verdict instead of responding to the jury's penultimate note requesting clarification of the conspiracy charge. The defendant waived any claim to have the court issue additional instructions in response to that note pursuant to Practice Book § 42-27, and the defendant therefore waived any appellate issues connected to the court's decision to proceed to a verdict. Accordingly, we decline to review the defendant's claim.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The jury found the defendant not guilty of the charges of home invasion in violation of § 53a-100aa (a) (2), burglary in the first degree in violation of § 53a-101 (a) (1), and robbery in the first degree in violation of § 53a-134 (a) (4).

[2] Jose Guerrero, Carlos Guerrero and Vasques are originally from El Salvador.

[3] The court imposed sentence on the conviction of conspiracy to commit home invasion. The counts for conspiracy to commit burglary in the first degree and conspiracy to commit robbery in the first degree were merged into the conviction of conspiracy to commit home invasion.

The defendant did not raise the issue, before or at the time of oral argument before this court, of whether the trial court should have vacated the convictions on two of the conspiracy charges and sentenced the defendant on the remaining conspiracy conviction instead of merging two of the conspiracy convictions into the conviction on the conspiracy to commit home invasion charge. See *State* v. *Polanco*, 308 Conn. 242, 245, 61 A.3d 1084 (2013); *State* v. *Wright*, 144 Conn. App. 731, 748, 73 A.3d 828, cert. granted, 310 Conn. 945,     A.3d     (2013). Because he had the opportunity but failed to do so, this court declines to rule on this issue in this appeal.

[4] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[5] General Statutes § 53a-100aa (a) provides in relevant part: "A person is guilty of home invasion when such person enters or remains unlawfully in a dwelling, while a person other than a participant in the crime is actually present in such dwelling, with intent to commit a crime therein, and, in the course of committing the offense . . . (2) such person is armed with explosives or a deadly weapon or dangerous instrument."

[6] General Statutes § 53a-101 (a) provides in relevant part: "A person is guilty of burglary in the first degree when (1) such person enters or remains unlawfully in a building with intent to commit a crime therein and is armed with explosives or a deadly weapon or dangerous instrument . . . ."

[7] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . ."

General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

[8] Practice Book § 42-27 provides: "If the jury, after retiring for deliberations, requests additional instructions, the judicial authority, after providing notice to the parties and an opportunity for suggestions by counsel, shall recall the jury to the courtroom and give additional instructions necessary to respond properly to the request or to direct the jury's attention to a portion of the original instructions."

[9] The subject sentence in the court's jury instructions provided: "It is enough if he knows that a conspiracy exists or that he is creating one and that he intends to join with at least one other person in an agreement to commit a crime."

The defendant claims that the inquiry indicated that the jury believed that the defendant's mere knowledge of the existence of a conspiracy was sufficient to convict him of the conspiracy charges.

We note that this court upheld an identical conspiracy instruction when challenged in *State* v. *Taylor*, 132 Conn. App. 357, 361–67, 31 A.3d 872 (2011), appeal dismissed, 309 Conn. 83, 71 A.3d 464 (2013) (certification improvidently granted). In *Taylor*, the trial court also gave the following instruction with respect to conspiracy: "The mere knowledge, acquiescence or approval of the object of the agreement without cooperation or agreement to cooperate, however, is not sufficient to make one a party to a conspiracy to commit the criminal act." (Emphasis omitted; internal quotation marks omitted.) Id., 363. An identically worded instruction was given by the court in the present case, and, significantly, that instruction immediately followed the language questioned by the jury in its note to the court. The fact that it reached its verdict less than twenty minutes after having made that inquiry suggests that the jury continued to review the written jury instructions during its deliberations and discovered the answer to its inquiry on its own.

[10] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) *State* v. *Golding*, 213 Conn. 239–40.